UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,              CRIMINAL NO. 09-20473

    v.                        DISTRICT JUDGE VICTORIA A. ROBERTS

RAFAEL C. MURREY (D-1),      MAGISTRATE JUDGE MARK A. RANDON
CHARLES A. DAVIS (D-2),
JONATHAN A. DAVIS (D-3),
BRANDI N. DAVIS (D-4), and
AMBER KINGSLEY (D-5),

        Defendants.
_____/

**REPORT AND RECOMMENDATION
REGARDING THE PRE-TRIAL MOTIONS OF DEFENDANTS
RAFAEL MURREY AND CHARLES DAVIS (DKT. NOS. 69-73 AND 75-78)**

**I.  INTRODUCTION AND PROCEDURAL HISTORY**

This case involves the Government's prosecution of participants in an alleged large-scale

narcotics trafficking operation.  On December 15, 2009, the Government obtained a superseding

indictment against five defendants, two of whom, Rafael Murrey ("Murrey") and Charles Davis

("Davis") (collectively "Defendants"), have between them filed nine pre-trial motions now pending

before the Court.  Murrey filed four motions: (1) to compel discovery (Dkt. No. 75); (2) to suppress

evidence or, in the alternative, for a *Franks* hearing (Dkt. No. 76); (3) to preclude the in-court

identification of Murrey (Dkt. No. 77); and (4) to preclude admission of certain 404(b) evidence

(Dkt. No. 78).  Davis filed five motions: (1) to disclose *Brady* materials (Dkt. No. 69); to sever

Davis' case from his co-defendants (Dkt. No. 70); to require disclosure and production of informants or, in the alternative, for an in camera hearing (Dkt. No. 71); to obtain notice of the government's intention to offer 404(b) evidence (Dkt. No. 72); and to suppress evidence seized from an illegal search (Dkt. No. 73).

On May 11, 2010, the Court referred Defendants' motions to the undersigned for a Report and Recommendation.  The Government filed responses to each of Defendants' motions, and, after counsel jointly sought and received two adjournments for good cause, an evidentiary hearing was conducted on July 20, 2010.  After receiving questions propounded by Davis counsel on September 21, 2010, the undersigned also conducted an in camera interview of a Government confidential source of information on September 22, 2010.

As discussed below in Section III(A), based on the representations of the Government and defense counsel, it is **RECOMMENDED** that the following motions be **DENIED** as moot: (1) Murrey's motion to compel discovery (Dkt. No. 75); (2) Murrey's motion to preclude his in-court identification (Dkt. No. 77); (3) Davis' motion to disclose Brady materials (Dkt. No. 69); and (4) Davis' motion regarding 404(b) evidence (Dkt. No. 72).  It is **FURTHER RECOMMENDED** that with respect to the remaining motions: Murrey's motion to suppress evidence or, in the alternative, for a *Franks* hearing (Dkt. No. 76) be **DENIED;** Murrey's motion to preclude admission of certain 404(b) evidence (Dkt. No. 78) be **GRANTED** and all of Davis' remaining motions be **DENIED** for the reasons set forth below in Sections III (B) and (C).

## II.  FACTS

As recounted in the affidavit of United States Drug Enforcement Agency ("DEA") Special Agent ("SA") Michael Brouillard, the salient facts are as follows:[1]

**A.  The DEA's reverse-sting operation targeting "Baldy"**

On December 2, 2008, DEA agents attempted a "reverse-sting"[2] operation that involved a DEA-Chicago Confidential Source ("CS1") and a target-individual in Detroit, Michigan, known only as "Baldy."[3]  (Dkt. No. 2, Affidavit, ¶1)  Several DEA-monitored calls were placed by CS1 to Baldy, to advise him that approximately forty (40) kilograms of cocaine would arrive in Detroit during the evening hours of December 2, 2008. *Id.*  At approximately 6:00 p.m., DEA agents in Detroit put together a large hockey bag that contained "sham" kilograms of cocaine and placed the bag in the rear hatch area of a white Ford Windstar van. *Id.*  Another DEA Confidential Source from the Detroit area ("CS2") was designated to drive the van to the delivery location. (Tr. 9)

Later that evening, CS1 contacted Baldy to set up delivery of the "sham" cocaine. *Id.* at  ¶ 2.  "Baldy" confirmed that the delivery location would be in the area of Conner and Warren Avenue

---

[1] Where appropriate, the facts are supplemented with references to the motion hearing transcript of July 20, 2010 ("Tr. __"), and the parties' briefs.

[2]  In a "reverse-sting" operation, agents "reverse" their typical strategy of identifying suspected drug dealers through undercover buys and, instead (using confidential sources or undercover agents) set up fake narcotics sales.

[3] CS1 indicated to the DEA that he had sold multiple kilogram quantities of cocaine to Baldy in the past and to another individual known as "Mack" (who agents later determined to be Davis). *See* § II(B), *infra.*  The DEA considered CS1 reliable because he had previously provided them with information that resulted in the arrest of several drug dealers and the seizure of large quantities of narcotics and U.S. currency. (Dkt. No. 73-1, ¶ 19)

-3-

in Detroit. *Id.*  CS1 advised Baldy to look for a white Ford Windstar van with Illinois license plates. *Id.*  Baldy said he would be driving "[a] burgundy Jeep." *Id.*

Baldy was subsequently observed by Task Force Officer ("TFO") Joe Marsh and SA Craig Frothingham arriving at the delivery location. *Id.* at ¶ 3.  Baldy pulled up next to CS2, who was sitting in the white Ford Windstar van, and parked his burgundy Jeep.  SA Frothingham observed Baldy exit his vehicle and contact CS2 at the driver's side of CS2's vehicle. *Id.*  Baldy then walked to the rear of CS2's vehicle and opened the rear hatch.  At that point, SA Grace instructed all surveillance units to move in to arrest Baldy. *Id.*  SA Jeff Moore and SA Dan Weber attempted to block Baldy's vehicle from the front.  SA Fountain and SA Brouillard, fully outfitted in Police/DEA identification jackets, exited their vehicle and approached Baldy. *Id.*  SA Fountain yelled, "Police, you're under arrest, don't move." *Id.*  Baldy disregarded SA Fountain's order and ran back to his vehicle, which had the engine running. *Id.*  Baldy entered the driver's side door of the vehicle and attempted to flee the scene.  SA Fountain approached Baldy's vehicle from the passenger side and ordered Baldy to stop.  Baldy again disregarded this order and accelerated at a high rate of speed across the parking lot. *Id.*  As Baldy sped forward, SA Fountain was attempting to get into Baldy's vehicle and was still holding onto the car door. *Id.*  Meanwhile, SA Grace had positioned his police vehicle in front of Baldy's Jeep.  Baldy rammed the Jeep into the rear quarter panel of SA Grace's vehicle. *Id* at ¶ 4.  The Jeep forced SA Grace's vehicle out of the way and continued to speed across the parking lot, causing several law enforcement officers to jump out of the way to avoid being struck. *Id.*  Baldy eventually managed to elude law enforcement in the parking lot and escape following a high speed chase, which was terminated by law enforcement after the Jeep continued to speed through a residential neighborhood. *Id.*

-4-

**B.  The search warrant for Davis' residence**

In March of 2009, as part of the DEA's ongoing investigation, a search warrant was sought for Davis' residence in Southfield, Michigan. The information used to obtain the search warrant was provided by CS1, who stated that he had also supplied multiple kilogram quantities of cocaine to an individual known as "Mack."  CS1 further identified Mack as the father of Brandi Davis (who police had recently arrested for accepting delivery of 25 kilograms of cocaine).  SA Fountain was then able to determine that Mack was Davis, who had a 1995 conviction for conspiracy with intent to distribute heroin. (Dkt. No. 73-1 ¶ 22)  Through a trash pull, agents confirmed Davis' residence and a search warrant was signed by a United States Magistrate Judge.  According to Davis, however, the affidavit in support of the search warrant contained no statements relating to particular criminal activity at his residence.

### 1.  Search of a vehicle on the Davis' property

At the motion hearing, SA Grace testified about his role in executing the search warrant for Davis' residence, which resulted in the seizure of various items, including a minivan.  SA Grace testified that the minivan was parked in the driveway of Davis' residence, and that he sought and received permission from Davis to search the vehicle. (Tr. 37-38)  SA Grace further testified that Davis was likely handcuffed at the time he consented to the search of the minivan, and that he was uncertain whether Davis had been mirandized before the minivan was searched. (Tr. 48)  After a trained dog alerted agents to the "front dashboard area," SA Grace discovered a storage compartment, behind the dashboard, where the airbag had been removed. (Tr. 38) The minivan was, therefore, seized.

**C. Agents determine that Baldy is Murrey and not Jonathan Davis**

DEA efforts to arrest Baldy continued.  For at least two months after Baldy's daring escape, agents focused their attention on an individual named Jonathan Davis – who they believed was Baldy.  However, in July of 2009, two Sources of Information ("SOIs") independently came forward (SOI1 and SOI2) with additional information about the December 2, 2008 incident described above.  SOI1 stated that the vehicle used to ram the Agents' cars was registered under Baldy's wife's name and had possibly been sent to the "crusher," in an attempt to thwart law enforcement. *Id*. at ¶ 6.  SOI1 further related that the individual known as "Baldy," and/or "Eastside Ray," had some type of ownership in a motorcycle shop in Detroit. *Id.*  SA Fountain conducted property inquires concerning this business and found the possible owner to be Murrey. *Id.*  SOI2 also stated that "Baldy" was known as "Eastside Ray," but that his real name was Rafael. *Id.*  Based upon this information, SA Fountain obtained Murrey's driver's license photos from the Michigan Secretary of State.  According to SA Brouillard, upon reviewing the photos, "law enforcement agents" identified Murrey as the individual driving the Jeep who attempted to run them over on December 2, 2008. *Id.*  However, SA Fountain's DEA 6 Report states that SA Fountain concluded Baldy was Murrey, after comparing Murrey's driver's license photograph to another photograph of Murrey provided by SOI2 – without reference to the December 2nd incident.

Besides reviewing Murrey's driver's license photograph, agents also learned that a Jeep was, in fact, registered to Murrey's wife. *Id.* at ¶ 7 (Tr. 72) After tracing and locating this vehicle, which had been recently sold, SA Brouillard recognized it as being the same make, model and color Jeep that attempted to hit agents in the parking lot. *Id.* at ¶¶ 10-12.  The Jeep also showed signs of

repaired front-end damage.  All of these factors were indicative of Murrey's potential involvement in the December 2, 2008 incident.

## D.  The search warrant for Murrey's residence

On September 10, 2009, a United States Magistrate Judge authorized a search warrant for Murrey's residence, based upon the sworn statements of SA Brouillard (some of which are set forth above).  Davis contends that Brouillard's affidavit contained "intentional falsehoods and material omissions. (Dkt. No. 76, p. 3)  Specifically, Davis claims that the affidavit in support of the warrant: omitted the previous misidentification of Baldy; falsely included evidence that agents had independently identified Baldy from the crime scene; and made no link to any criminal activity occurring at Murrey's residence. (Tr. 66-67)  Law enforcement seized various items incident to the search of Murrey's residence.

## E.  The charges against Defendants and Murrey's 2009 arrest for fleeing and eluding

On December 15, 2009, a grand jury issued a superseding indictment that charged Murrey with attempted possession with intent to distribute five kilograms or more of cocaine (count one); and assaulting, resisting or impeding certain officers or employees (counts two and three).  Murrey, Davis, Jonathan Davis, Brandi Davis and Amber Kingsley were also charged with conspiracy to possess with intent to distribute five kilograms or more of cocaine (count four), and conspiracy to possess with intent to distribute heroin.

Both Murrey and Davis have prior arrests and/or convictions on their records.  Of particular interest to the Government, however, is Murrey's 2009 arrest for fleeing and eluding.  As proffered by the Government, the circumstances surrounding the arrest are as follows:

On June 4, 2009, three members of the Detroit Police Department, driving in full uniform and a fully marked scout car, observed Defendant Murrey driving a silver Range Rover Sport Utility Vehicle ("SUV") at an excessive speed, almost hitting a group of children. (Dkt. No. 100-1).  The officers performed a traffic stop of the Range Rover and, as the officer approached the stopped SUV, Murrey sped off in an apparent effort to elude police.  A seven block, high-speed chase through a residential neighborhood ensued.  As Murrey was being pursued, the officers observed him throw an object out of the driver's side window.  Shortly thereafter, the Range Rover slowed down, stopped, and Murrey was taken into custody.  The officers went back and searched the area where they believed the object had been discarded, but no contraband was found. (Dkt. No. 100, p. 2)

### III.  ANALYSIS

**A.  Motions recommended to be denied as moot**

#### *1.  Murrey's motion to compel discovery*

In his motion to compel discovery (Dkt No. 75), Murrey requests "the government's file as it relates to its investigation into Jonathan Davis [the individual DEA agents initially believed was Baldy] because it would be exculpatory for Defendant Murrey."  During the motion hearing, the Government indicated that all known documents relating to the misidentification of Baldy as Jonathan Davis had been provided to Murrey and that there is no separate investigation file related to Jonathan Davis. (Tr. 76-78)  Murrey's lawyer also indicated that there is no specific document he believed the Government was withholding, but rather the motion was filed to ensure the Government was meeting its obligation to provide documents under Fed. R. Crim. P. 16.  Therefore, in as much as there is no pending discovery issue related to Murrey and the Government recognizes its continuing obligation to provide discovery, the motion to compel should be denied as moot.

-8-

### 2. *Murrey's motion to preclude his in-court identification*

During the hearing on the instant motions, Murrey's lawyer clarified that the motion to preclude an in-court identification (Dkt. No. 77) related only to any identification of Murrey by government agents. (Tr. 64-65)  The Government represented that it would not identify Murrey through government agents but would, instead, identify him through the testimony of other witnesses. (Tr. 64)  Murrey's lawyer had no objection to the identification of his client through the testimony of other witnesses (Tr. 65) and, therefore, the motion should be denied as moot.

### 3. *Davis' motion to disclose Brady materials*

In this motion Davis seeks disclosure of certain "exculpatory and/or impeaching information" pursuant to Fed. R. Crim. P. 16(a)(1)(c) and *Brady v. Maryland*, 373 U.S. 83 (1963). (Dkt. No. 69)  The Government sought denial of the motion as moot, indicating it intended to fully comply with Davis requests within a few days of July 20, 2010. (Tr. 56)  On September 22, 2010, the Court held a telephone conference with counsel for the Government and Davis, in which Davis' counsel confirmed  receipt of these documents.  As such, this motion should be denied as moot, as the Government recognizes its continuing obligation to provide documents.

### 4. *Davis' motion regarding 404(b) evidence*

Davis also seeks an order requiring the Government to provide notice of "any and all evidence of other crimes, wrongs, and/or bad acts which the government may offer during the trial of the instant matter." (Dkt. No. 72)  The Government stated, on the record, that it did not intend to offer any 404(b) evidence against Davis. (Tr. 56)  As such this motion should also be denied as moot.

**B.  Murrey's remaining motions**

    *1.  Murrey's motion to suppress or, in the alternative, for a Franks hearing*

Murrey moves to suppress evidence gathered as the result of the search warrant for his residence or, in the alternative, for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). (Dkt. No,76)  A defendant is entitled to a hearing to challenge the validity of a search warrant (a so called "*Franks* hearing") only if he can make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, *and . . .*the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155-56 (emphasis added).  Moreover, as the Government correctly recognizes, the Sixth Circuit has held that an affidavit which omits a potentially exculpatory fact is "less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin,* 107 F.3d 1213, 1217 (6th Cir. 1997); *United States v. Graham,* 275 F.3d 490, 506 (6th Cir. 2001).

    *a.  A Franks hearing is not warranted*

Murrey argues that two material falsehoods and/or omissions contained in the affidavit of SA Brouillard, submitted in support of the search warrant for Murrey's residence, mandate a *Franks* hearing: (1) SA Brouillard's statement that, after obtaining and reviewing Murrey's driver's license, "**law enforcement agents** identified Murrey as the individual driving the Jeep who attempted to run them over on December 2, 2008" (Emphasis added); and, (2) SA Brouillard's failure to include in his affidavit the fact that, for several months, agents had believed Baldy was an individual known as Jonathan Davis.  Neither argument is well-taken.

First, with respect to how he was identified, Murrey argues that none of the agents independently recognized him from the scene of the December 2nd incident. Murrey correctly points out that **SA Fountain's** DEA6 report states that SA Fountain made the identification by comparing a photograph of Murrey, provided by SOI2, to Murrey's driver's license. However, Murrey's conclusion that **SA Brouillard's** affidavit is, therefore, false is a non sequitur. Several law enforcement agents were present in the parking lot on December 2, 2008 and had the opportunity to see the driver of the Jeep. Thus, while SA Fountain may not have independently identified Murrey as the driver of the Jeep, a number of other agents may well have, rendering Murrey's assertion that "[n]one of the agents . . .identified the man in the picture as the man who drove the Jeep" conclusory at best. *Franks*, 438 U.S. at 171 ("[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory"). Besides SA Fountain's DEA 6 Report (which speaks only to the actions taken by SA Fountain), Murrey's motion provides no evidence that undermines SA Brouillard's assessment of how other agents identified Baldy as Murrey – much less establish that it is a deliberate falsehood.

As to SA Brouillard's failure to include the agents' earlier misidentification of Baldy as Jonathan Davis, it is an omission without consequence for the purpose of establishing probable cause. SA Brouillard's affidavit outlines several steps taken by agents to support their determination that Baldy was Murrey. In addition to the photographic comparison (as Murrey claims), the SOIs provided other information, much of which was verified by agents, strongly suggestive of Murrey's involvement in the December 2nd incident. *See* § II(C), *supra*. Therefore, the undersigned finds that inclusion of the prior misidentification in the affidavit would not negate the existence of probable

cause.  In sum, Murrey's preliminary showing is not substantial, does not mandate a *Franks* hearing, and the motion should be denied.

### b. Probable cause exists as there is an adequate nexus between Murrey's residence and evidence of narcotics trafficking

Murrey's final challenge to the affidavit is that "it did not establish a sufficient nexus to determine that evidence of illegal activity would probably be found in [his] home." (Dkt. No. 76, p. 5)  Essentially, Murrey argues that even assuming a basis existed for his arrest on charges of drug possession and distribution, without more, the search warrant for his house lacks probable cause.

The Sixth Circuit recently reaffirmed that "[t]here must. . . be a nexus between the place to be searched and the evidence sought." *U.S. v. Howard,* No.08-6143, slip op. at 28 (6th Cir. Sept. 14, 2010).  However, in *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004), the Sixth Circuit cited, with approval, the decision of the Fifth Circuit in *U.S. v Robins*, 978 F.2d 881 (5th Cir. 1992). In *Robins*, the defendant claimed that evidence obtained from a search of his home was illegally obtained, because there was not a sufficient nexus between the criminal activity and his residence. As in this case, the DEA/police had provided sworn statements detailing Robins' role in a large-scale marijuana distribution operation, which they obtained through a reverse-sting operation.  But, the warrant was authorized without any additional evidence linking criminal activity to his residence. *Id.* at 891.  In finding a sufficient nexus, the court held:

> A nexus between the place to be searched and the items to be seized may be established through direct observation or through normal inferences. (Citation omitted). A residence is a quite convenient, commonly-used place for planning continuing criminal activities like large-scale marijuana trafficking and money laundering conspiracies. There was undoubtedly an adequate nexus, between Robins' residence and Detective Soule's allegations to the Magistrate Judge about Robins' marijuana operation, to support the search warrant for the marijuana and related

records Detective Soule's experience and common sense told him would likely be at Robins' residence.

*Id*. at 892.

Here, SA Brouillard's affidavit in support of the search warrant *for evidence of narcotics trafficking* stated that, based on his training and experience, "[i]t is common for drug traffickers to conceal drug records, drug proceeds. . .within their residences."  This statement, coupled with SA Brouillard's detailed allegations linking Murrey to a large-scale cocaine distribution operation and attempts to injure law enforcement on December 2, 2008, established a sufficient nexus for the search of his residence. *See also United States v. Gunter,* 551 F.3d 472 (6th Cir. 2009) (where the search warrant affidavit shows that the resident had made repeated purchases of one or more kilograms of cocaine, it was reasonable to infer there would be evidence of drug trafficking in his home).  As such, Murrey's motion to be suppress should also be denied for this reason.

### 2. *Murrey's motion to preclude admission of certain 404(b) evidence*

At the motion hearing, the issue relating to this motion was considerably narrowed.  With respect to Murrey's criminal history, the Government seeks only to introduce his 2009 arrest for fleeing and eluding under Fed. R. Evid. 404(b) as a means to establish Murrey's identity as the driver of the Jeep on December 2, 2008. (Dkt. No. 100)[4]  Murrey primarily argues that the June 2009 arrest is inadmissable because there are no "signature or unique characteristics" between that arrest and the fleeing incident on December 2, 2008, and thus the evidence is improperly offered to show propensity.  The undersigned agrees.

---

[4] The Government does not stipulate that these acts are inadmissible should Murrey decide to take the witness stand or to rebut other possible assertions made during any potential defense case-in-chief.

Fed. R. Evid. 404(b) states:

(b) **Other Crimes, Wrongs, or Acts.**--Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Before 404(b) evidence is admitted, a district court must apply a three-step analysis. *See United States v. Johnson*, 27 F.3d 1186, 1190 (6th Cir. 1994), *cert. denied*, 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995).  A party seeking to admit 404(b) evidence must first demonstrate that the claimed bad act(s) occurred. *Id.*  The offering party must then cite a specific purpose for which the evidence is submitted, and the trial court must then determine whether the probative value of the identified purpose outweighs the risk of unfair prejudice. *Id.*  A party seeking admission of "other acts" evidence must, therefore, show the evidence is probative of a material issue other than character. *See Huddleston v. U.S.*, 485 U.S. 681, 686, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). With respect to using "other acts" to determine identity, the Sixth Circuit has "overwhelmingly" recognized its propriety where identity is the central issue in the case. *U.S. v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006).  However, while the two acts need not be identical, they must have "sufficient distinctive similarity" to avoid improper use as propensity evidence. *Id.* (Where the suspect in both bank robberies carried a gun in a bookbag, sought change for a $50, purchased money orders and only then removed his gun, a sufficient distinctive similarity or signature existed).

The Government argues that the signature similarities between the two acts are: (1) the fact that on both occasions, the suspect was driving an SUV (a Jeep and a Ranger Rover); (2) both acts

-14-

involved a high speed chase; and (3) all or part of both chases went through a residential neighborhood.  Certainly, the admission of evidence sought is relevant to the issue of identity; however, the undersigned finds that the two acts do not contain sufficient distinctive similarity and are, thus, not offered for a proper purpose.

First, the popularity of SUVs in the United States is widespread.[5]  Thus, while not eclipsing the number of cars on the road, the fact that SUVs (of different price range, model and color, etc.) were involved in both acts is inconsequential.  Further, high speed chases are a consequence of most fleeing and eluding cases and oftentimes either begin in or continue through residential areas (the objective being not to stop, regardless of location).[6]  When stripped of these "signature similarities," and considering the differences in both acts[7], all that remains is the fact that because Murrey was arrested for fleeing and eluding in 2009, he is more likely the person who attempted to flee from law enforcement the parking lot in December of 2008 – in other words, impermissible propensity evidence.  In sum, because the two acts do not evince any unique pattern of behavior or conduct

---

[5]  Automotive sales watchdog Autodata has found that the large SUV segment is growing at a faster pace than the America's small car segment. www.autoblog.com/2010/07/30.

[6]  Indeed, that "[a] portion of the violation [for fleeing and eluding] occurred in an area where the speed limit is 35 miles an hour or less, whether that speed limit is posted or imposed as a matter of law [such as in a residential neighborhood]" is one of three circumstances by which the crime of third degree fleeing and eluding is *always* established. Mich. Comp. Laws § 750.479a(3)(a)-(c).

[7]  Most notably, unlike the December 2, 2008 incident, Murrey eventually slowed down and stopped in the June 2009 incident.

suggestive of a common perpetrator, Murrey's motion to preclude introduction of the 2009 arrest should be granted.[8]

## C. Davis' remaining motions

### 1. Davis' motion to sever case from co-defendants

Davis also moves to be tried separately from his four co-defendants. (Dkt. No. 70) Without much factual support, Davis offers seven grounds for his request: (1) that the co-defendants will likely have conflicting or inconsistent defenses; (2) that a joint trial will violate his Sixth Amendment right to be able to confront the witnesses against him; (3) that he may be denied access to the exculpatory testimony of co-defendants Rafael C. Murrey, Jonathan A. Davis, Brandi Davis, and Amber Kingsley, should they choose not to testify; (4) that highly inflammatory evidence will be introduced against some, but not all of the co-defendants, which may confuse the jury; (5) that there is evidence that Defendant he was not a part of the conspiracy for some time; (6) that grouping him with his co-defendants in a trial presents an assumption to the jury that all of the defendants worked together and shared the same knowledge about every aspect of their lives; and (7) that the risk that the jury will not, or cannot, follow instructions is so great and the consequences of failure are so vital to him that a severance should be granted. None of these proffered grounds for relief are persuasive.

Davis' role in the alleged conspiracy is detailed in Counts Four and Five of the superseding indictment. (Dkt. No. 30) Count Four alleges that from September 2007 to December 2, 2008, Davis took an active role in a conspiracy that transported and distributed multi-kilogram quantities of

---

[8] This ruling renders moot Murrey's less persuasive argument that because charges emanating from the 2009 arrest were dismissed, the Government could not prove that the act occurred.

cocaine from the greater Chicago, Illinois area to the greater Detroit, Michigan area. This conspiracy allegedly involved Davis, his nephew, his daughter, her boyfriend, and her best friend, among others, driving kilogram loads of cocaine to Detroit in vehicles with hidden compartments. Count Five alleges that defendant Davis entered into an agreement to distribute heroin with his daughter, her best friend, and others.

Rule 14 of the Federal Rules of Criminal Procedure governs whether defendants should be severed for trial. It provides that if the defendant or the government is prejudiced by joinder of offenses or of defendants, the court may order separate trials of counts, grant a severance of defendants, or provide whatever relief justice requires. *See* Fed. R. Crim. P. 14(a). There is, however, a preference for joint trials of defendants. *United States v. Cobleigh*, 75 F.3d 242 (6th Cir. 1996). The jury is presumed to be capable of sorting out the evidence. *Id.* If there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or would prevent the jury from making a reliable judgment, the court should grant a severance. But, it is the defendant's burden to produce a "strong showing of factually specific and compelling prejudice" that will mislead or confuse a jury. *Id.* If the defendant is able to show some potential jury confusion, "such confusion must be balanced against society's interest in speedy and efficient trials." *Id.*

Davis' first, fourth, sixth and seventh grounds for relief, without more, are evidentiary issues that a jury is presumed, with appropriate instructions from the court, to be able to sort out. *Id.* Typically, in a multi-conspirator crime, each conspirator has differing roles which may, or may not, overlap in furthering the conspiracy. Other than the timing of his entry into the conspiracy (discussed below), Davis has presented no facts which tend to demonstrate the jury will be unable to distinguish the roles of each defendant in assessing criminal culpability.

Davis' second ground claims a joint trial will violate his Sixth Amendment right to be able to confront the witnesses against him.  At the hearing, the Government indicated that the only inculpatory statement made by any defendant was that of defendant Amber Kingsley.  The Government further indicated that they "were not going to" introduce this statement against Davis, and could not do so pursuant to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). (Tr. 60)  Davis did not identify any other potential confrontation issue that may arise from a joint trial.  As to his third ground, Davis has made no factual showing that any of his co-defendants possess any exculpatory evidence of which he will be deprived by having a joint trial.

Davis does provide a factual basis for his fifth ground in support of his motion for a separate trial.  Specifically, Davis claims that although the Government alleges that the conspiracy among the co-defendants dates back to 2007, an unindicted Government witness, Justin Turner, states that Davis did not "approach him" until September of 2008.  As such, Davis contends that, at a joint trial, the jury will hear highly inflammatory evidence of events alleged to have occurred well before his involvement in the alleged conspiracy.  The Government responds that Turner will testify that Davis' involvement in heroin dealing (for which he has also been charged) predated his participation in the cocaine conspiracy, and that his engagement in the cocaine distribution operation was nonetheless part of an ongoing series of criminal acts constituting the charged offense. (Dkt. No. 85, p. 3)  The Government's position is well-taken.

Rule 8(b) of the Federal Rules of Criminal Procedure permits joinder of two or more defendants in a single indictment where "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  The Sixth Circuit has held that a group of acts or transactions constitute a "series" if they are logically

-18-

interrelated. *U.S. v. Johnson,* 763 F.2d 773 (6th Cir.), *cert. denied*, 106 S.Ct. 178 (1985). Here, regardless of Davis' precise entry date into the conspiracy, the Government alleges that Davis' role was inextricably linked to that of his co-defendants. In particular, the indictment alleges that Davis, along with Murrey and Jonathan Davis would pay Brandi Davis and Amber Kingsley for the cocaine, which they would then transport to Chicago. (Dkt No. 30, ¶ 7) It is also alleged that Davis played a joint role in the distribution and sale of the cocaine. *Id.*

In sum, the joinder of Davis and his co-defendants is proper and the undersigned finds, for the reasons stated above, that Davis has failed to meet his burden of showing a factually specific and compelling prejudice that will mislead or confuse a jury. Therefore, Davis' motion for a separate trial should be dismissed.

### 2. *Davis' motion to require disclosure and production of informants*

During the motion hearing, the Government and Davis agreed to an in camera hearing at which the undersigned would meet with CS2 and determine whether CS2's identification should be disclosed to Davis. (Tr. 15-17) On September 21, 2010, Davis' counsel submitted, untimely, a list of questions to be asked of CS2 during the in camera hearing.[9]  On September 22, 2010, the undersigned met with CS2; utilized Davis' questions to examine him; and asked a number of follow up questions. Having done so, the undersigned finds that, with respect to Davis, CS2 has no relevant and helpful information, or any other information essential to a fair determination of the case.

---

[9] The questions were initially due on or about August 4, 2010. On September 8, 2010, the undersigned entered an Order requiring the questions to be submitted on or before September 15, 2010. (Dkt. No. 103) A stipulation and order extending the deadline to September 20, 2010 was entered on September 16, 2010. Davis finally submitted his questions on September 21, 2010.

Therefore, Davis has failed to overcome the privilege protecting the disclosure CS2's identity set forth in *Rovario v. U.S.*, 353 U.S. 53 (1957)[10]

### 3. Davis' motion to suppress evidence seized from an illegal search

Finally, Davis seeks to suppress the evidence obtained from the search of his residence.  Like Murrey, Davis argues that the affidavit in support of the search warrant lacked a nexus to criminal activity at his residence.  For the reasons set forth in § III(B)(1)(b), above, having established probable cause to believe Davis was a co-conspirator in a large-scale cocaine distribution operation and that large scale dealers tend to maintain evidence of their distribution operations in their residences, the search was proper.  Davis' claim that the search warrant for his residence did not justify the search or seizure of the minivan parked on his property is also misplaced.

SA Grace testified that he obtained Davis' consent to search the minivan that was parked in the driveway of Davis' residence.  However, even if the consent was improperly obtained, since paragraph three of the search warrant affidavit avers that based on the DEA agent's experience and through his training, it is common to find certain evidence of drug trafficking (to include ledgers, cell phones, telephone numbers of customers, money, fictitious identification, etc.) in a drug trafficker's residence *and automobile,* the search and seizure of the minivan in the driveway of the residence was proper. *See for example U.S. v. Gottschalk,* 915 F.2d 1459, 1461 (10th Cir. 1990) ("[a] search warrant authorizing a search of a certain premises generally includes any vehicles located within its curtilage if the objects of the search might be located therein.").

-------

[10] During the September 22, 2010 telephone conference, Davis' counsel indicated there was no longer an issue with respect to the identity of CS1. *See also* Tr. 17.

## IV.  CONCLUSION

For the reasons stated above, IT IS **RECOMMENDED** that the following motions be **DENIED** as moot: (1) Murrey's motion to compel discovery (Dkt. No. 75); (2) Murrey's motion to preclude his in-court identification (Dkt. No. 77); (3) Davis' motion to disclose Brady materials (Dkt. No. 69); and (4) Davis' motion regarding 404(b) evidence (Dkt. No. 72).  It is **FURTHER RECOMMENDED** that Murrey's motion to suppress evidence or, in the alternative, for a *Franks* hearing (Dkt. No. 76) be **DENIED;** Murrey's motion to preclude admission of certain 404(b) evidence (Dkt. No. 78) be **GRANTED;** Davis' motion to sever Davis' case from his co-defendants (Dkt. No. 70) be **DENIED**; Davis' motion to require disclosure and production of informants or, in the alternative, an in camera-hearing (Dkt. No. 71) be **DENIED**; and Davis' motion to suppress evidence seized from an illegal search (Dkt. No. 73) be **DENIED.**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address  each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE

Dated:  September 24, 2010

<u>Certificate of Service</u>

*I hereby certify that a copy of the foregoing document was served on the parties of record on this date, September 24, 2010, by electronic and/or first class U.S. mail.*

*s/Melody R. Miles*
*Case Manager to Magistrate Judge Mark A. Randon*
*(313) 234-5542*